UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

DEMOS P. DEMOPOULOS, RALPH BLASI,    *
WILLIAM CASSESE, JOHN A. CURCIO, and    *
KENNETH BARRETT, as Trustees and    *
Fiduciaries of the LOCAL 854 PENSION FUND,    *
   *
          Plaintiffs,    *
   *
     - against -    *    **CASE 1:25-CV-07175-JLR**
   *
ALLIED TRANSIT CORP.,    *
EMPIRE STATE BUS CORP.,    *
EMPIRE CHARTER SERVICE, INC., and    *
ANNA C. GANNESS, DDS, PC,    *
   *
          Defendants.    *

---------------------------------------------------------------X

<u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' PETITION TO<br>VACATE THE ARBITRATION AWARD</u>

**TABLE OF CONTENTS**

INTRODUCTION...................................................................................................... 1

LEGAL AND FACTUAL BACKGROUND .......................................................... 2

A.  The Employers' Complete Withdrawal From The Fund ................................. 2

B.  The Fund Experiences A Substantially All Mass Withdrawal ......................... 3

C.  The Fund Experiences A Plan Termination Mass Withdrawal, And
     The Trustees Rescind The Substantially All Assessments ............................... 4

D.  The Arbitration Award.................................................................................... 7

STANDARD OF REVIEW ..................................................................................... 8

ARGUMENT............................................................................................................ 9

I.  The Arbitrator Erred, As A Matter Of Law, In Finding That The
    Fund Owes Interest At The Rate Of 18% Per Annum................................ 10

    A.  The Arbitrator Erred When She Applied Standards Unique
        To Federal Court Actions To Conclude That The Fund
        Established A Plan Rule Pursuant To The Governing
        PBGC Regulations ................................................................................... 11

    B.  The Arbitrator Further Erred As A Matter Of Law In Finding
        That A Single Instance Of Attempting To Collect Interest On
        Defaulted Withdrawal Liability Payments At The Rate Of 18%
        Per Annum Established A Plan Rule When The Fund Had Not
        Established A Consistently Applied Rate ................................................. 16

II.  The Arbitrator Erred In Failing To Develop A Sufficient
     Evidentiary Record Which Could Further Demonstrate That The
     Fund Owed Interest At the PBGC Prime Rates ........................................... 19

CONCLUSION ....................................................................................................... 23

WORD COUNT CERTIFICATION...................................................................... 24

i

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Allied Painting & Decorating, Inc. v. Int'l Painters & Allied Trades
Indus. Pension Fund, No. 21-CV-13310, 2023 BL 72001*
(D.N.J. Mar. 1, 2023).................................................................................. 19

*Bd. of Trs. of Priv. Sanitation Union Loc. 813 Pension Fund v. Metro
Demolition Contracting Corp.*, No. 10-CV-00195 (DLI) (RER),
2010 BL 417233 (E.D.N.Y. Sept. 17, 2010)............................................... 14

*Central States, Southeast & Southwest Areas Pension Fund v. Central
Transp.,* 472 U.S. 559 (1985) ..................................................................... 15

*Demopoulos v. Advance Transit Co.*, No. CV 20-5186 (DRH) (ARL),
2021 BL 481738 (E.D.N.Y. Dec. 17, 2021) ............................................... 7,12-
                                                                                13

*Emp'r Ret. Fund v. Quad/Graphics, Inc., Case No. 16-CV-100 (ODW)*,
2017 BL 154953 (C.D. Cal. May 8, 2017) ................................................. 14

*Ganton Techs, Inc. v. Nat'l Indus. Grp. Pension Plan*, 76 F.3d 462
(2d Cir. 1996)............................................................................................... 15

*HOP Energy, L.L.C. v. Local 553 Pension Fund*, 678 F.3d 158 (2d Cir. 2012) ....... 8

*I.A.M. Nat'l Pension Fund Benefit Plan C v. Stockton TRI Indus.,*
727 F.2d 1204 (D.C. Cir. 1984)................................................................... 8,10

*ILGWU Nat'l Ret. Fund v. Levy Bros. Frocks*, 846 F.2d 879 (2d Cir. 1988)............ 3

*Mar-Can Transp. Co. v. Loc. 854 Pension Fund*, 722 F. Supp. 3d 355
(S.D.N.Y. 2024), *appeal docketed*, No. 24-CV-1431 (2d Cir. 2025)........................ 18

*Nat'l Ret. Fund v. Metz Culinary Mgmt., Inc.*, 946 F.3d 146 (2d Cir. 2020) ............ 8

*Nat'l Pension Plan of the UNITE HERE Workers Pension Fund v. Swan
Fishing Co.*, No. 05-CV-6819 (SAS), 2006 BL 60897
(S.D.N.Y. May 10, 2006)............................................................................. 12

*Pension Benefit Guar. Corp. v. R.A. Gray & Co*., 467 U.S. 717 (1984) ................... 3

*666 Drug, Inc. v. Tr. of 1199 SEIU Health Care Emps. Pension Fund*,
571 F. App'x 51 (2d Cir. 2014) ................................................................... 8

## TABLE OF AUTHORITIES, CONTINUED

**Cases**                                                                    **Page(s)**

*Steelworkers Pension Tr. v. Renco Grp., Inc.*, No. 18-CV-142,
2019 BL 371331 (W.D. Pa. Sept. 30, 2019) ................................................ 14

*The N.Y.C. Times Co. v. Newspaper & Mail Deliverers'-Publishers'*
*Pension Fund*, 303 F. Supp. 3d 236 (S.D.N.Y. 2018) ................................. 8,17,
20-23

*Trs. of 1199 SEIU Health Care Emps. Pension Fund v. Traymore*
*Chemists, Inc.*, No. 13-CV-4070 (MKB), 2014 BL 410515
(E.D.N.Y. June 25, 2014) ............................................................................. 14

*Trs. of Hollow Metal Pension Fund v. Morris Fine Furniture Work*
*Shop, Inc.*, No. 16-CV-09480 (LAK) (KHP), 2019 BL 226307
(S.D.N.Y. Mar. 15, 2019), *report and recommendation, adopted in full,*
2019 BL 225074 (S.D.N.Y. June 19, 2019)................................................. 14

*Trs. of the Leather Goods, Handbags, & Novelty Workers' Union Loc. 1*
*Joint Ret. Fund v. Cent. Fur Storage Co.*, No. 18-CV-7224 (AMD) (RER),
2019 BL 290579, at \*6 (E.D.N.Y. Aug. 2, 2019), *report and recommendation*
*adopted*, 2019 BL 309899, (E.D.N.Y. Aug. 20, 2019)............................... 4

*Trs. of the Local 813 Pension Tr. Fund v. Frank Miceli Jr. Contracting, Inc.*,
No. 13-CV-0198 (MKB) (JO), 2017 BL 77551 (E.D.N.Y. Mar. 13, 2017)............. 14

*Trs. of United Teamster Pension Fund A v. Juniors Produce Inc.*,
No. 15-CV-6927 (ARR) (ST), 2016 BL 288829 (E.D.N.Y. Aug. 31, 2016) ............ 13

*Trs. of Hollow Metal Pension Fund v. Morris Fine Furniture Work Shop,*
*Inc.*, No. 16-CV-09480 (LAK) (KHP), 2019 BL 226307
(S.D.N.Y. Mar. 15, 2019) ............................................................................ 14

*UFCW Loc. 174 Pension Fund v. 5600 Mkt. Corp.*, No. 17-CV-5789,
2018 BL 296562 (E.D.N.Y. Aug. 16, 2018), *report and recommendation*
*adopted as modified*, 2018 BL 332935 (E.D.N.Y. Sept. 14, 2018).......................... 4

*Unite Natl. Retirement Fund v. Veranda Mktg. Co.*, No. 04-cv-9869 (BSJ),
2009 BL 149989 (S.D.N.Y. July 9, 20091) ................................................ 12

*United Auto Workers Local 259 Soc. Sec. Dep't v. Metro Auto Ctr.*,
501 F.3d 283 (3d Cir. 2007)......................................................................... 14

## TABLE OF AUTHORITIES, CONTINUED

**Statutes**                                                      **Page(s)**

29 C.F.R. § 4001.2 .................................................................................... 5

29 C.F.R. § 4219.11 .................................................................................. 4,9

29 C.F.R. § 4219.16 .................................................................................. 4

29 C.F.R. § 4219.18 .................................................................................. 4

29 C.F.R. § 4219.31 .................................................................................. 9-11, 16

29 C.F.R. § 4219.32 .................................................................................. 6,8-9-11,14-18

29 C.F.R. § 4219.33 .................................................................................. 6-7,9-11,16-18-20

9 U.S.C.A. § 10(3) .................................................................................... 19

26 U.S.C. § 6621 ...................................................................................... 15

29 U.S.C. 1001 ......................................................................................... 2-3

29 U.S.C. § 1132 ...................................................................................... 12-15

29 U.S.C. § 1145 ...................................................................................... 12

29 U.S.C. § 1381 ...................................................................................... 2

29 U.S.C. § 1383 ...................................................................................... 3

29 U.S.C. § 1391 ...................................................................................... 3

29 U.S.C. § 1399 ...................................................................................... 10,14

29 U.S.C. § 1401(b)(2) ............................................................................ 8,19

29 U.S.C. § 1415 ...................................................................................... 18

## <u>TABLE OF AUTHORITIES, CONTINUED</u>

**<u>Statutes</u>**                                                                                               **<u>Page(s)</u>**

29 U.S.C. § 1451 .......................................................................................................    6-7,10-
                                                                                                              13

The Trustees of the Local 854 Pension Fund (collectively, the "Fund," or "Plaintiffs"), by and through their undersigned attorneys, respectfully submit this memorandum of law in support of their petition to vacate the July 29, 2025 Arbitration Award (the "Award") issued by Arbitrator Broach in *Allied Transit Corp, et al., v. Local 854 Pension Fund*, AAA Case No. 01-24-0005-9667, and *Anna C. Ganness, DDS, PC v. Local 854 Pension Fund,* AAA Case No. 01-24-0006-0114.

Plaintiffs move pursuant to 29 U.S.C. § 1401(b)(2) to vacate the Award, which determined that the Fund was required to pay interest at the rate of 18% per annum on overpaid and subsequently refunded interim mass withdrawal liability payments to Defendants Allied Transit Corp., Empire State Bus Corp., and Empire Charter Service, Inc. ("Allied"), and Anna C. Ganness, DDS, PC ("Ganness") (together, "Defendants," or the "Employers").

## INTRODUCTION

This action arises from arbitration proceedings initiated by the Employers after the Fund experienced a mass withdrawal when substantially all of the participating employers withdrew from the Fund (the "Substantially All Mass Withdrawal"). After the Fund experienced the Substantially All Mass Withdrawal, it assessed the Employers with reallocation liability and, where applicable, redetermination liability in August 2023. In June 2025, the Trustees of the Fund voted to withdraw the reallocation and redetermination liability assessments issued in connection with the Substantially All Mass Withdrawal with prejudice and to assess reallocation liability and, where applicable, redetermination liability pursuant to a plan termination mass withdrawal for the plan year ending August 31, 2022 (the "Plan Termination Mass Withdrawal"). The Fund accordingly refunded the Employers for the interim payments made in connection with

1

the reallocation and redetermination liability assessments (the "Refunded Interim Payments") made in connection with the Substantially All Mass Withdrawal.

The petition to vacate the Award in front of this Court addresses a single issue of statutory interpretation: the applicable interest rate that the Fund is required to pay on the Refunded Interim Payments. The Fund submits that it is required to pay interest at the rates set forth by the applicable Pension Benefit Guaranty Corporation ("PBGC") regulations. The Employers submit that the Fund is required to pay interest at the rate of 18% per annum.

For the reasons set forth below, the Fund respectfully submits that this Court should vacate the Award and find that the Fund is required to pay interest at the applicable rates set forth by the PBGC (the "Prime Rates") on the Refunded Interim Payments. In the alternative, the Fund respectfully submits that the Court should vacate the Award and remand the decision to the Arbitrator for the parties to develop a sufficient evidentiary record.

## LEGAL AND FACTUAL BACKGROUND

This action concerns withdrawal liability under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*., as amended by the Multiemployer Pension Plan Amendments Act of 1980 (the "MPPAA"), 29 U.S.C. § 1381, *et seq*. Pursuant to ERISA, employers such as Allied and Ganness contribute to multiemployer pension funds for the benefit of the covered employees, retirees, and their dependents. As relevant here, the Employers previously employed members of Local 553, I.B.T., and its predecessor Local 854, I.B.T. (the "Union"), pursuant to a series of collective bargaining agreements that required contributions to the Fund. (Kellner Decl. ¶¶ 4–7.)

If an employer decreases or ceases its contributions to a pension fund, it may be assessed with a withdrawal liability assessment to compensate for the fund's unfunded obligations. 29

2

U.S.C. § 1381. The MPPAA, which requires an employer withdrawing from a multiemployer plan to continue funding its proportionate share of the plan's unfunded vested benefits, was established to "relieve the funding burden on remaining employers and to eliminate the incentive to pull out of a plan." *ILGWU Nat'l Ret. Fund v. Levy Bros. Frocks*, 846 F.2d 879, 881 (2d Cir. 1988) (quoting H.R. Rep. No. 96-869, pt. 1, at 67 (1980), reprinted in 1980 U.S.C.C.A.N. 2918, 2935). Thus, if an employer who is required to contribute to a fund ceases or withdraws from that fund, the employer becomes subject to withdrawal liability. 29 U.S.C. § 1381(a). An employer effectuates a "complete withdrawal" from a plan when it "(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a).

### A.    The Employers' Complete Withdrawal From The Fund

The Employers here incurred complete withdrawals from the Fund within the meaning of during the plan year ending August 31, 2021. (Kellner Decl. ¶ 8; *see also* 29 U.S.C. §§ 1381, 1383(a).) The Employers accordingly were liable to the Fund for their "proportionate share of the plan's 'unfunded vested benefits,' calculated as the difference between the present value of vested benefits and the current value of the plan's assets." *Pension Benefit Guar. Corp. v. R.A. Gray & Co*., 467 U.S. 717, 725 (1984); *see* 29 U.S.C. §§ 1381, 1391. The initial withdrawal liability amounts are not in dispute in this petition to vacate the Award.

### B.    The Fund Experiences A Substantially All Mass Withdrawal

After the initial withdrawal liability, the Fund experienced the Substantially All Mass Withdrawal when substantially all of the participating employers withdrew from the Fund.

3

(Kellner Decl. ¶¶ 9–10; *see* 29 C.F.R. §§ 4219.11, 4219.16, 4219.18.)  A mass withdrawal occurs when all, or substantially all, employers withdraw from or cease their obligations to contribute to a multiemployer pension plan.  *See Trs. of the Leather Goods, Handbags, & Novelty Workers' Union Loc. 1 Joint Ret. Fund v. Cent. Fur Storage Co.*, No. 18-CV-7224 (AMD) (RER), 2019 BL 290579, at *6, n.3 (E.D.N.Y. Aug. 2, 2019), *report and recommendation adopted*, 2019 BL 309899, (E.D.N.Y. Aug. 20, 2019).  "Mass withdrawal liability is simply an extension of withdrawal liability, but modifies the method for calculating the amount of liability and imposes additional procedures in light of the changed incentives to employers and needs of the plan that arise when no employers continue to participate actively."  *UFCW Loc. 174 Pension Fund v. 5600 Mkt. Corp.*, No. 17-CV-5789, 2018 BL 296562, at *6 (E.D.N.Y. Aug. 16, 2018), *report and recommendation adopted as modified*, 2018 BL 332935 (E.D.N.Y. Sept. 14, 2018).

After the Fund experienced the Substantially All Mass Withdrawal, it assessed the Employers with reallocation liability and, where applicable, redetermination liability and it set forth a schedule requiring quarterly payments for 60 quarters pursuant to 29 C.F.R § 4219.16. (Kellner Decl. ¶ 9, Exh. B.)  In total, Allied paid $42,859.00 and Ganness paid $8,600 in connection with these assessments.  (*Id*. ¶ 13.)  The Fund has reimbursed the Employers for these payments.[1]  (*Id*. ¶¶ 13, 21.)  The applicable interest rate required on the Refunded Interim Payments is the basis of the Fund's petition to vacate the Award.

---

[1] The Fund notes that Fund and Allied are still addressing the appropriate amount of the principal on this refund.  (*Id*.)  The appropriate amount of principal does not affect the applicable interest rates at stake here.

C.    The Fund Experiences A Plan Termination Mass Withdrawal, And The Trustees Rescind The Substantially All Assessments

After the Substantially All Mass Withdrawal, the Fund subsequently experienced a Plan Termination Mass Withdrawal when an arbitration award dated May 5, 2025 in connection with a different arbitration for another participating employer (the "Cousins Award") triggered a plan termination mass withdrawal in the plan year ending in August 31, 2022.[2]  (*Id*. ¶ 11.)  On May 16, 2025, the Fund advised the Arbitrator and the Employers in writing that as a result of the Cousins Award, the Fund experienced a Plan Termination Mass Withdrawal in the plan year ending August 31, 2022.  (Anspach Decl. ¶ 3; Kellner Decl. ¶ 11.)   During a Board of Trustees meeting held on or about June 10, 2025, the Trustees unanimously passed a motion to (1) rescind the Substantially All Mass Withdrawal assessments with prejudice, and (2) assess the participating employers with liability for the Plan Termination Mass Withdrawal.  (Anspach Decl. ¶ 4, Exh. A; Kellner Decl. ¶¶ 8–12.)  On the same day, the Fund advised the Arbitrator and the Employers in writing that the Trustees had voted to withdraw the Substantially All Mass Withdrawal liability assessments with prejudice.  (Anspach Decl. ¶ 4, Exh. A.)

On or about July 21, 2025, the Fund informed the Employers that it was refunding the principal amounts paid by the Employers in connection with the rescinded Substantially All Mass Withdrawal liability assessments. (*Id*. ¶ 6; Kellner Decl. ¶¶ 13–20.)  Between July 21 and July 23, 2025, the parties and the arbitrator exchanged limited emails concerning the applicable interest rate for the Refunded Interim Payments.  (Anspach Decl. ¶ 7.)  Fund counsel advised that

---

[2] PBGC regulations define the term mass withdrawal to mean: "(1) [t]he withdrawal of every employer from the plan, (2) [t]he cessation of the obligation of all employers to contribute under the plan, or (3) [t]he withdrawal of substantially all employers pursuant to an agreement or arrangement to withdraw."  29 C.F.R. § 4001.2.  The Cousins Award triggered a Plan Termination Mass Withdrawal pursuant to 29 C.F.R. § 4001.2.

the Fund had a practice of not charging interest on overdue withdrawal liability payments or to pay interest on withdrawal liability overpayments, pursuant to 29 C.F.R. §§ 4219.32(b)–4219.33. (*Id.*, Exh. B.)  Fund counsel also requested that the Employers' counsel should advise how much interest was owed and the basis of that claim if the Employers disagreed.  (*Id.*)

On July 24, 2025, the Employers submitted an email to the Arbitrator claiming that the Fund owed interest at the rate of one-and-one-half percent (1–1/2%) per month, or 18% per annum (the "July 24 email").  (*Id.* ¶ 8, Exh. C.)  The Employers' counsel attached twelve exhibits to the July 24 email, including, among other things, evidence that (1) on one occasion, the Fund had attempted to collect interest at the rate of 18% on defaulted withdrawal liability payments from another employer in federal court pursuant to 29 U.S.C. § 1451(b) (the "2021 Advance Transit § 1451 Action"), and (2) the Fund had calculated refunds for at least two employers (including Allied) at the PBGC Prime Rates in August 2024 (the "August 2024 Refunds").  (*Id.* ¶ 8, Exh. C, Exhs. 1, 3–4, 6–12.)

Approximately three hours after the Employers' July 24 email, the Arbitrator ordered that "no further submissions should be made" until a decision was issued concerning, among other things, the applicable interest rates.  (*Id.* ¶ 9, Exh. D.)  Accordingly, the Fund was not provided with an opportunity to respond to the Employers' July 24 email.  Had the Fund been provided with an opportunity to respond, it would have presented substantial evidence further demonstrating that the Fund had not established a plan rule for applicable interest rates on overpaid and subsequently refunded interim withdrawal liability payments pursuant to 29 C.F.R. § 4219.33.  This evidence includes:

1.  The Fund's Trust Agreement, which is silent in connection with applicable interest rates on withdrawal liability payments. (Kellner Decl. ¶ 6, Exh. A; Anspach Decl. ¶ 12.)

2.       A rejected amendment to the Fund's Trust Agreement, that would have set interest rates on late or refunded withdrawal liability payments. (Anspach Decl. ¶ 13, Exh. E.)

3.       Correspondence from counsel to the Fund's TPA instructing the TPA to calculate the August 2024 refunds at the PBGC Prime Rates because the Fund had not established a plan rate pursuant to 29 C.F.R. § 4219.33. (Kellner Decl. ¶¶ 16–17; Anspach Decl. ¶ 14–15.)

4.       At least one refund in the amount of $1,505,055.00 that the Fund returned to other participating employers without interest. (Kellner Decl. ¶ 18., Exh. D; Anspach Decl. ¶ 16, Exh. F.)

5.       Representations from the Fund's current TPA that it has not charged interest on overdue withdrawal liability payments outside of federal court litigation. (Kellner Decl. ¶¶ 15-16.)

**D.      The Arbitration Award**

On July 29, 2025, the Arbitrator issued a brief six-page decision where, as is relevant here, she ordered the Fund to reimburse the Employers with interest at the rate of 18% per annum on the Refunded Interim Payments. (Award, ECF. No. 6, Exh. A.) The Arbitrator relied entirely on one instance where the Fund sought to collect interest at the rate of 18% per annum to conclude that the Fund had established a plan rule for applicable interest rates on withdrawal liability payments pursuant to 29 C.F.R. § 4219.33. This one instance occurred during the 2021 Advance Transit § 1451 Action—a proceeding commenced pursuant to 29 U.S.C. § 1451(b) to compel payment when another participating employer (Advance Transit) defaulted on the initial withdrawal liability amounts that it owed the Fund. The Arbitrator provided her full reasoning as follows:

> [T]he Fund has a policy of charging interest of 18% per annum on overdue and defaulted withdrawal liability payments. Claimant has provided documents showing that, in an action to compel payment of defaulted withdrawal liability, Respondent asserted that it was entitled to interest at that rate pursuant to its collection policy. The court awarded the Fund interest on the delinquent withdrawal payments at the requested 18% rate. *See, Demopoulos v. Advance Transit,* 20-cv-5186 (EDNY). Since Section 4219.33 provides

7

that plan rules must be applied uniformly, the appropriate interest rate to be used in the instant arbitrations is 18% per annum.

(Award at 5.)

The Arbitrator did not address additional evidence submitted to her, including the August 2024 refunds calculated for Allied and Jofaz at the Prime Rates set forth in PBGC regulation 29 § C.F.R. 4219.32(b).  (*See* Award.)

## STANDARD OF REVIEW

ERISA compels employers to arbitrate disputes over withdrawal liability, but provides for independent judicial review of the final arbitration award.  29 U.S.C. § 1401(b)(2). [3]  Pursuant to ERISA, federal courts reviewing an arbitrator's legal conclusions apply a *de novo* standard of review.  *666 Drug, Inc. v. Tr. of 1199 SEIU Health Care Emps. Pension Fund*, 571 F. App'x 51, 52 (2d Cir. 2014); *HOP Energy, L.L.C. v. Local 553 Pension Fund*, 678 F.3d 158, 160 (2d Cir. 2012).  An arbitrator's factual findings are rebuttable only by a clear preponderance of the evidence.  *Nat'l Ret. Fund v. Metz Culinary Mgmt., Inc.*, 946 F.3d 146, 149 (2d Cir. 2020).  For mixed questions of law and fact, courts generally adopt a clear error standard of review in the absence of controlling precedent.  *The N.Y.C. Times Co. v. Newspaper & Mail Deliverers'-Publishers' Pension Fund*, 303 F. Supp. 3d 236, 265 (S.D.N.Y. 2018) (citing *666 Drug, Inc.*, 571 F. App'x at 52).  Because this motion to vacate the Award depends entirely on whether the

---

[3] The standard of review for a petition to vacate an ERISA arbitration award brought pursuant to 29 U.S.C. § 1401(b)(2) differs from the standard of review or a petition to vacate an arbitration award brought pursuant to the Federal Arbitration Act (the "FAA"), 9 U.S.C.A. § 10.  *See I.A.M. Nat'l Pension Fund Benefit Plan C v. Stockton TRI Indus.*, 727 F.2d 1204, 1212, n. 7 (D.C. Cir. 1984) ("Arbitration under MPPAA is quite plainly to be distinguished from arbitration based upon the contractual provisions of a collective bargaining agreement.").

Arbitrator applied the correct governing regulations for interest rates on the Refunded Interim Payments, the Arbitrator's decision is reviewed *de novo.*

## ARGUMENT

The Arbitrator's finding that the Fund owed interest on the Refunded Interim Payments at the rate of 18% per annum is based on a mistake in statutory and regulatory interpretation.  The statutory framework and applicable regulatory guidelines are straightforward: a Fund is required to refund overpaid withdrawal liability payments at the Prime Rates set forth by PBGC unless it has established a plan rule for overdue, defaulted and overpaid withdrawal liability payments. *See* 29 C.F.R. §§  4219.11, 4219.31(d), 4219.32 and 4219.33.

29 C.F.R. § 4219.31(d), in relevant part, provides:

> **Overpayments.** If the plan sponsor or an arbitrator determines that payments made in accordance with the schedule of payments established by the plan sponsor have resulted in an overpayment of withdrawal liability, the plan sponsor shall credit interest on the overpayment from the date of the overpayment to the date on which the overpayment is refunded to the employer at the same rate as the rate for overdue withdrawal liability payments, as established under §4219.32 or by the plan pursuant to §4219.33.

(emphasis in original.)

Pursuant to 29 C.F.R. § 4219.32(b), interest on withdrawal liability payments shall be charged at the PBGC's Prime Rates unless the plan has adopted rules pursuant to 29 C.F.R. § 4219.33.

29 C.F.R. § 4219.33, in relevant part, provides:

> Plans may adopt rules relating to overdue and defaulted withdrawal liability, provided that those rules are consistent with ERISA. These rules may include, but are not limited to, rules for determining the rate of interest to be charged on overdue, defaulted and overpaid withdrawal liability  . . .  **Plan rules shall operate and be applied uniformly with respect to each employer[.]**

(emphasis added).

It is evident that this Fund had not established a plan rule in connection with interest rates on overpaid and subsequently refunded withdrawal liability payments pursuant to 29 C.F.R. § 4219.33. The Arbitrator's reliance on one instance where the Fund sought interest on defaulted[4] withdrawal liability payments in federal court to determine that the Fund had established a plan therefore misapplied the governing regulations. The Arbitrator committed a legal error that flouted the applicable governing regulations when the Fund was ordered to pay interest at the rate of 18% annum on the Refunded Interim Payments, rather than at the Prime Rates set forth by the PBGC pursuant to 29 C.F.R. § 4219.32(b).

As discussed below, the Arbitrator erred as a matter of law based on the record in front of her. This error warrants vacatur of the Award. The Arbitrator further erred as matter of law when she ordered the Fund not to respond to the Employers' July 24 email. Had the Fund been provided with the opportunity to respond, it would have submitted additional substantial evidence supporting its position that the Employers misconstrued the governing PBGC regulations in their position that the Fund owed interest at the rate of 18% per annum on the Refunded Interim Payments.

**I.        The Arbitrator Erred, As A Matter Of Law, In Finding That The Fund Owes Interest At The Rate Of 18% Per Annum**

---

[4] ERISA provides a specific framework for defaulted withdrawal liability payments. When an employer withdraws from a Fund and subsequently fails to pay the required interim withdrawal liability payments, a Fund is required to advise the employer that it has 60 days to cure its nonpayment and that a failure to cure the nonpayment constitutes a default pursuant to 29 U.S.C. § 1399(c)(5). The relevant Refunded Interim Payments here are overpaid withdrawal liability payments, whereas the payments in the Advance Transit § 1451(b) litigation were defaulted payments. These two different categories of withdrawal liability payments are addressed separately in the statute, *see* 29 C.F.R. § 4219.31(d), and federal courts apply unique remedial standards for actions commenced pursuant to 29 U.S.C. § 1451(b) to compel defaulted withdrawal liability payments, which do not apply to overpaid and subsequently refunded withdrawal payments. *See infra, Section I.A.*

A.      *The Arbitrator Erred When She Applied Standards Unique To Federal Court Actions To Conclude That The Fund Established A Plan Rule Pursuant To The Governing PBGC Regulations*

The Arbitrator misconstrued the governing regulations when she applied to the overpaid and subsequently Refunded Interim Payments at stake here a decision awarding interest at the rate of 18% per annum on a defaulted withdrawal liability payment in a § 1451(b) federal action. The Arbitrator mistakenly determined that the interest rate sought in a federal court action commenced pursuant to 29 U.S.C. § 1451(b) established that the Fund had a plan rule in connection with interest rates on overpaid and subsequently refunded interim withdrawal liability payments pursuant to the applicable PBGC regulations.  This error in statutory and regulatory interpretation warrants vacatur of the Award.

The Arbitrator correctly identified that: "if the Fund has not, in fact, established an interest rate for overdue, defaulted and overpaid withdrawal liability payments pursuant to Section 4219.33, the interest rate to applied would be the rate set forth in 4219.32." (Award at 5.)  The Arbitrator, however, erred as matter of law when she applied a rate for defaulted withdrawal liability payments sought in federal court to overpaid and subsequently refunded withdrawal liability payments.  This is because the governing standards for federal actions brought to compel defaulted withdrawal liability payments pursuant to 29 U.S.C. § 1451(b) differ from the governing rules that determine whether a Fund has established a plan rule for interest rates on overpaid withdrawal liability payments outside of federal litigation pursuant to the governing PBGC regulations.  *See* 29 C.F.R. §§ 4219.31(d), 4219.32 and 4219.33.

ERISA provides that "[in] any action under this section to compel an employer to pay withdrawal liability, any failure of the employer to make any withdrawal liability payment within the time prescribed *shall be treated in the same manner as a delinquent contribution* (within the

11

meaning of section 1145 of this title)." 29 U.S.C. § 1451(b) (emphasis added). Accordingly, when a fund obtains a federal court judgment on defaulted withdrawal liability payments in a §1451(b) action, the remedies are treated in the same manner as the remedies for delinquent contributions. This includes a mandatory award of interest, liquidated damages, and attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g)(2). *Unite Natl. Retirement Fund v. Veranda Mktg. Co.*, No. 04-CV-9869 (BSJ), 2009 BL 149989, at \*4 (S.D.N.Y. July 9, 2009) (citing 29 U.S.C. § 1132(g)(2)(B)) ("In any action to collect withdrawal liability 'in which a judgment in favor of the plan is awarded, the court shall award the plan,' in addition to the unpaid withdrawal liability, reasonable attorneys' fees and costs, interest, and liquidated damages."); *see also Nat'l Pension Plan of the UNITE HERE Workers Pension Fund v. Swan Fishing Co.*, No. 05-CV-6819 (SAS), 2006 BL 60897, at \*4 (S.D.N.Y. May 10, 2006).

Because 29 U.S.C. § 1451(b) provides that federal actions to compel employers to make withdrawal liability payments "shall be treated in the same manner as delinquent contributions," courts will look to the interest rates provided by a fund for delinquent contributions—including when a fund has not established a policy for applicable interest rates on withdrawal liability payments. *See* 29 U.S.C. § 1451(b); 29 U.S.C. § 1132(g)(2)(E) ("[I]nterest on unpaid contributions shall be determined by the using the rate provided under the plan)."

The Arbitrator and the Employers cite the decision in *Demopoulos v. Advance Transit Co.* as determinative of the interest rate applicable to the Refunded Interim Payments. No. CV 20-5186 (DRH) (ARL), 2021 BL 481738 (E.D.N.Y. Dec. 17, 2021), *report and recommendation, adopted*, 2022 BL 9316 (E.D.N.Y. Jan. 11 , 2021). (Award at 5; Anspach Decl. ¶ 8.) The *Advance* court, however, made no reference to the PBGC regulations that govern overpaid and subsequently refunded withdrawal liability payments. Instead, the *Advance* court followed the

12

plain language of 29 U.S.C § 1451(b) to find that the failure of an employer to make payments on defaulted withdrawal liability is treated in the same manner as in a federal action to compel payment of delinquent contributions. *Advance Transit Co*., 2021 BL 481738, at *4 (citing 29 U.S.C. § 1451(b)).  Because the employer defaulted on its obligations to make timely withdrawal liability payments pursuant to 29 U.S.C. § 1399(c)(5), and the Fund had to resort to filing an action in federal court to compel the payments, the *Advance* court correctly held that Fund was entitled to damages pursuant to 1132(g)(2)(B), including a mandatory  remedy of interest.[5] *Id.*

To determine the applicable interest rate, the *Advance* court looked to the Fund's Trust Agreement for delinquent contributions because ERISA instructs that "interest on unpaid contributions shall be determined by using the rate [for delinquent contributions] under the plan[.]"  29 U.S.C. § 1132(g)(2)(E).  The *Advance* court's finding that the employer owed interest at the rate of 18% per annum thus has no significance in connection with whether the Fund had established a plan rule for applicable interest rates on withdrawal liability payments outside of federal court actions.

Federal courts in this circuit, although not uniformly, have similarly applied a fund's stated interest rate for delinquent contributions in § 1451(b) actions commenced to compel the payment of defaulted withdrawal liability. *See Trs. of United Teamster Pension Fund A v. Juniors Produce Inc.*, No. 15-CV-6927 (ARR) (ST), 2016 BL 288829, at *6 (E.D.N.Y. Aug. 31, 2016) ("The amount of interest on withdrawal liability judgments brought pursuant to 29 U.S.C.

---

[5] It is noteworthy that the *Advance* court also ordered the employer to pay liquidated damages, and attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g)(2).  Neither the Arbitrator nor the Employers are arguing that § 1132(g)(2)'s  additional mandatory damages, such as liquidated damages were owed on the Refunded Interim Payments.  This further demonstrates that the interest owed pursuant to an action brought pursuant to § 1132(g)(2)'s remedial scheme is distinct from the relevant PBGC regulations governing this dispute concerning the Refunded Interim Payments.

§ 1132(g)(2) 'shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of [the Internal Revenue Code]'"); *Trs. of 1199 SEIU Health Care Emps. Pension Fund v. Traymore Chemists, Inc.*, No. 13-CV-4070 (MKB), 2014 BL 410515, at *9 (E.D.N.Y. June 25, 2014); *Bd. of Trs. of Priv. Sanitation Union Loc. 813 Pension Fund v. Metro Demolition Contracting Corp.*, No. 10-CV-00195 (DLI) (RER), 2010 BL 417233, at *4 (E.D.N.Y. Sept. 17, 2010) (same).[6]

To the extent that courts in this circuit have split on the applicable interest rates for defaulted withdrawal liability payments, it is because some courts have found that the PBGC rates are the appropriate rates, even in a § 1451(b) action. *Trs. of the Local 813 Pension Tr. Fund v. Frank Miceli Jr. Contracting, Inc.*, No. 13-CV-0198 (MKB) (JO), 2017 BL 77551, at *2, n.2  (E.D.N.Y. Mar. 13, 2017) ("Courts have approved both approaches in the absence of a plan that dictates applicable rates."); *see Trs. of Hollow Metal Pension Fund v. Morris Fine Furniture Work Shop, Inc.*, No. 16-CV-09480 (LAK) (KHP), 2019 BL 226307, at *9 (S.D.N.Y. Mar. 15, 2019), r*eport and recommendation, adopted in full,* 2019 BL 225074 (S.D.N.Y. June 19, 2019) ("While it is true that courts within this Circuit have awarded interest in withdrawal liability

---

[6] Courts in other districts have also reasoned that it is appropriate to apply the "harsher remedies under 1132(g)(2)" when a Fund is forced to file an action to collect defaulted withdrawal liability payments "in keeping with the broader purpose of § 1132(g)(2) to discourage unnecessary litigation by the employer." *Steelworkers Pension Tr. v. Renco Grp., Inc.*, No. 18-CV-142, 2019 BL 371331, at *9 (W.D. Pa. Sept. 30, 2019) (citing *United Auto Workers Local 259 Soc. Sec. Dep't v. Metro Auto Ctr.,* 501 F.3d 283, 295 (3d Cir. 2007)); *see also Emp'r Ret. Fund v. Quad/Graphics, Inc.*, No. 16-CV-100 (ODW), 2017 BL 154953, at *6 (C.D. Cal. May 8, 2017) ("Rather, it appears to the Court that the interest calculation under § 4219.32 applies only where overdue withdrawal payments are collected before litigation commences. Once the Fund is forced to file an action to collect delinquent interim payments and obtains a judgment for such payments, the harsher remedies under § 1132(g)(2) apply."). These courts have emphasized that the appropriate rules governing applicable interest rates for withdrawal liability payments turn on whether the fund has commenced an action in federal court. *Id.* (reasoning that the court could not find any case or convincing evidence that it should apply 29 C.F.R. § 4219.32 "where the plain language of § 1132(g)(2) directs otherwise").

14

cases at the rates set forth in 26 U.S.C. § 6621 . . . having reviewed the applicable statutory provisions and regulations, this Court believes the interest rate previously awarded was in error. . . . The PBGC rates are clearly the more comparable rates since they pertain specifically to withdrawal liability").

Regardless of the different approaches taken by courts, what is most crucial here is that courts have not found that the applicable interest rates in § 1451(b) actions commenced to compel defaulted withdrawal liability payments establish a plan rule for applicable interest rates on overpaid and subsequently refunded withdrawal liability payments outside of litigation. Accordingly, seeking to collect interest at the rate set forth in the Fund's policy for delinquent contributions in a § 1451(b) action to compel defaulted withdrawal liability payments does not provide a basis for finding that the Fund has established a plan rule pursuant to 29 C.F.R. § 4219.33.[7] The interest rate that the *Advance* court applied does not determine whether the Fund had established a plan rule for withdrawal liability payments pursuant to the governing

---

[7] In the *Advance Transit Co.* case, the employer also never filed an answer or appeared in the case. As a result, the Fund obtained a default judgment, and the parties never litigated whether the applicable interest rate should have been the rates in accordance with 29 U.S.C. § 1132(g)(2) or 29 C.F.R. § 4219.32(b). The Trustees' decision to seek interest at the rate of 18% per annum set forth in the Trust Agreement for delinquent contributions is consistent with the Trustees fiduciary duty under ERISA to accomplish the general objectives of the maintaining the Fund solely in the interests of the participants and the beneficiaries. (Kellner Decl. ¶ 6, Exh. A.) The Supreme Court holds that "Trustee's interpretation of [plan documents] will not be disturbed if reasonable." *Central States, Southeast & Southwest Areas Pension Fund v. Central Transp.*, 472 U.S. 559, 568 (1985); *accord Ganton Techs, Inc. v. Nat'l Indus. Grp. Pension Plan*, 76 F.3d 462, 466 (2d Cir. 1996) ("[Where] plan documents give the trustees the discretion to interpret plan terms, we will not substitute our judgment for theirs unless the trustees' interpretation is arbitrary and capricious."). It is indisputable that 29 U.S.C. § 1132(g)(2) and 29 C.F.R §§ 4219.32–33 can prescribe different interest rates, and with the split authority, the Trustees' attempt to collect interest at the rate of 18% per annum was not arbitrary and capricious. Had the employer litigated the case, that might have arisen in front of the *Advance* court. But that did not occur, and—most importantly—the applicable interest rate in that case is not the issue here.

15

regulations. *See* 29 C.F.R. §§ 4219.31(d), 4219.32 and 4219.33. This is a crucial distinction that the Arbitrator misconstrued in the Award.

Based on the record in front of the Arbitrator, there are no instances of the Fund seeking to charge interest on overdue withdrawal liability payments outside of federal litigation. The Arbitrator's reliance on one instance of the Fund attempting to collect interest at the rate of 18% per annum on defaulted withdrawal liability payments in federal court to conclude that the Fund established a plan rule on overpaid and subsequently refunded withdrawal payments was a clear mistake of statutory interpretation.

This error warrants vacatur of the Award.

B.    *The Arbitrator Further Erred As A Matter Of Law In Finding That A Single Instance Of Attempting To Collect Interest On Defaulted Withdrawal Liability Payments At The Rate Of 18% Per Annum Established A Plan Rule When The Fund Had Not Established A Consistently Applied Rate*

The Arbitrator further erred as a matter of law in finding that the Fund was required to pay interest at the rate of 18% per annum on the Refunded Interim Payments when the record developed during the limited exchanges between the parties from July 21, 2025 to July 24, 2025 revealed that the Fund had not utilized a consistently applied interest rate for withdrawal liability payments.

The governing PBGC regulations are clear: to establish a plan rule for interest on withdrawal liability payments, the rule must "operate and be applied uniformly with respect to each employer." 29 C.F.R. § 4219.33. In the primary on point Southern District of New York decision, the *N.Y.C. Times* court found that the Newspaper & Mail Deliverers'-Publishers' Pension Fund had not adopted a rule pursuant to § 4219.33 because, among other things, the Fund had used various and inconsistent interest rates in connection with withdrawal liability payments. *N.Y.C. Times Co.*, 303 F. Supp. 3d at 265. ("[T]o accord with [§ 4219.33], any rule

16

adopted by the Fund needed to generally 'operate and be applied uniformly with respect to each employer.'").  Because the evidence demonstrated that the fund had not established a "consistently applied rate," the court ordered the fund to refund the employer at the applicable PBGC Prime rates pursuant to § 4219.32.  *Id*.  The relevant case law further clarifies that one-time or even occasional instances of a fund seeking interest on withdrawal liability payments at a certain rate—including the rate that a Fund has established for delinquent contributions—does not establish a plan rule pursuant to 29 C.F.R. § 4219.33.  *See N.Y.C. Times Co.*, 303 F. Supp. 3d at 265.

The Arbitrator here misapplied the statutory guidelines by placing undue emphasis on the Fund's attempt to collect interest at the rate of 18% per annum during the 2021 Advance Transit § 1451 Action.[8]  The evidence submitted in the Employers' July 24 email unmistakably demonstrates that the Fund has used varied interest rates in connection with withdrawal liability payments.[9]  Half of the exhibits submitted in the Employers' July 24 email reflect that the Fund calculated refunds for two employers—including Allied—at the PBGC Prime Rates in August 2024 after it was ordered to produce "an accounting of their withdrawal liability payments, and

---

[8] To be clear, the Arbitrator committed two legal errors that both relate to the 2021 Advance Transit § 1451 Action.  The first discussed, *supra* Section I.A., related to incorrectly applying the interest rates and statutory provisions for defaulted withdrawal liability in a § 1451(b) action to find that the Fund established a plan rule for overpaid withdrawal liability outside of federal court.  The second error, discussed in Section I.B, was finding that the Fund had established a plan rule based on one occurrence of seeking interest at 18% per annum when the evidence established that the fund had not utilized a consistently applied interest rate.

[9] As discussed, *infra* Section II, there is additional evidence supporting the Fund's position that the Fund did not submit after the Arbitrator instructed that no further submissions should be made approximately three hours after the Employers' July 24 email.

the calculated interest using the applicable refunds" in connection with an unrelated dispute.[10] (Kellner Decl. ¶ 17; *see* Anspach Decl. ¶ 8, Exh. C, Exhs. 6–12.)

In response to that order, the Fund's TPA calculated refunds pursuant to the applicable PBGC guidelines, namely, 29 C.F.R. § 4219.32. (Kellner Decl. ¶ 17.) The exhibits attached to the July 24 email plainly show that the Fund used the PBGC Prime Rates, which ranged between 3.25% and 8.5%, when calculating the applicable rates for the August 2024 Refunds. (Anspach Decl. ¶ 8, Exh. C, Exhs. 8, 12.) The calculation worksheets presented to the employers in connection with the August 2024 refunds both state: "Notes: Interest Rate in Accordance with PBGC Reg. 4219.32." (Anspach Decl. ¶ 8, Exh. C, Exhs. 8, 12.) This evidence plainly shows that Fund had not utilized a consistently applied interest rate in connection with withdrawal liability payments.[11] (Kellner Decl. ¶¶ 16–20.) Consequently, the applicable interest rates for the Refunded Interim Payments at stake here are the Prime Rates governed by § 4219.32(b).

The Award fails to even mention the August 2024 refunds, despite their relevance in revealing that the Fund had not utilized a consistently applied interest rate in connection with withdrawal liability payments. Instead, the Award focuses solely on the 2021 Advance Transit § 1451 Action. In doing so, the Arbitrator misinterpreted the relevant regulatory guidelines and failed to adhere to the relevant case law—in determining that the Fund had established a fund rule pursuant to 29 C.F.R. § 4219.33—when the evidence unmistakably evinces that the Fund

---

[10] The August 2024 Refunds related to litigation in connection with the appropriate reduction in the amount of withdrawal liability when there is a change in bargaining representative pursuant to 29 U.S.C. § 1415. *Mar-Can Transp. Co. v. Loc. 854 Pension Fund*, 722 F. Supp. 3d 355, 358 (S.D.N.Y. 2024), *appeal docketed,* No. 24-CV-1431 (2d Cir. 2025). That litigation is not relevant for this motion.

[11] The Fund also does not have a written policy concerning interest rates on withdrawal liability payments. As described, *infra,* n. 12, the Fund's delinquent contributions policy when read together with the Fund's Trust Agreement does not prescribe an interest rate for withdrawal liability payments.

had not used consistently applied interest rates in connection with withdrawal liability payments uniformly with respect to each employer.

### II.     The Arbitrator Erred In Failing To Develop A Sufficient Evidentiary Record Which Would Have Further Demonstrated That the Fund Owed Interest At The PBGC Prime Rates On The Refunded Interim Payments

As a threshold matter, the Arbitrator's misapplication of the governing statutes and regulations discussed, *supra* Section I, provides a sufficient basis to vacate the Award.  The Arbitrator further erred when she denied the Fund the opportunity to provide pertinent and relevant evidence demonstrating that the Fund has not uniformly applied a consistent interest rate for withdrawal liability payments.

The statute governing a district court's review of an ERISA award, 29 U.S.C. § 1401(b)(2), does not provide a specific standard for determining if a Fund was prejudiced by an arbitrator's refusal to consider material and pertinent evidence.  The FAA, however, provides a clear standard for vacating an arbitration award when an arbitrator "refus[es] to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced."  9 U.S.C.A. § 10(3).  In the absence of a clear standard, courts have analogized to this FAA standard when evaluating whether an arbitrator erred in refusing to hear relevant evidence in petitions to vacate ERISA awards brought pursuant to §1401(b)(2).  *See Allied Painting & Decorating, Inc. v. Int'l Painters & Allied Trades Indus. Pension Fund,* No. 21-CV-13310, 2023 BL 72001, at *14 (D.N.J. Mar. 1, 2023) (vacating an arbitration award brought pursuant to §1401(b)(2) while utilizing the FAA's standard for determining whether an arbitrator "refus[ed] to hear evidence pertinent and material to the controversy").

 Here, the Fund was denied the opportunity to respond to the Employers' July 24 email with material evidence demonstrating that the Fund had not established a plan rule pursuant to 29

19

C.F.R. § 4219.33.  Had the Fund been afforded the opportunity to respond, it would have submitted the substantial additional evidence detailed below.

First, the Fund's Trust Agreement reveals that the Fund did not maintain a written policy pertaining to late or overpaid withdrawal liability payments.  (*See* Kellner Decl. ¶ 6, Exh. A at 15–16).  The Employers' July 24 email included the Fund's collection policy, but it did not include the Fund's Trust Agreement. (Anspach Decl. ¶ 8, Exh. C, Exh. 2.)  The Fund's Trust Agreement clarifies that the policy of charging 18% per annum on delinquent contributions relates to delinquent contributions not withdrawal liability payments. [12]

Second, in or around October 2023, the Trustees' counsel considered but ultimately decided not to vote on a draft amendment to the Fund's Trust Agreement that would have set interest rates with respect to late or refunded withdrawal liability payments.  (Anspach Decl. ¶ 13.)  With respect to late withdrawal liability payments, the amendment would have provided an interest rate of one and one-half percent per month. With respect to withdrawal liability overpayments, the amendment would have fixed the interest rate at that provided by the PBGC. (Anspach Decl. ¶ 13, Exh E.)

Third, there is additional evidence revealing that the Fund's TPA calculated refunds for the participating employers at the Prime Rates in connection with the August 2024 refunds precisely because the Fund had not established a plan rule for overdue withdrawal liability payments.  On August 21, 2024, counsel advised the TPA to submit refunds at the Prime Rates:

---

[12] The Fund's collection policy submitted in the July 24 email concerning delinquent contributions does not establish a plan rule for applicable interest rates on withdrawal liability payments outside.  *See N.Y.C. Times Co.*, 303 F. Supp. 3d. at 261-62, 264 (finding that the interest rate in a fund's Trust Agreement for delinquent contributions did not apply to withdrawal liability payments where "that provision was part of the Trust Agreement to address employer contributions and, significantly, neither made a specific reference to withdrawal liability nor included a general statement as to 'any payment' of an employer when discussing interest rates").

"[s]ince the Fund does not have an interest rate for overdue withdrawal liability payments, our understanding is that the interest rate is the prime rate, which likely has changed over time. We'd ask that in putting together the accounting, you show the different interest rates being used at the different times." (Kellner Decl. ¶ 17.)

Fourth, on at least one occasion, the Fund refunded participating employers on overpaid withdrawal liability payments without interest. On or about January 9, 2024, the Fund refunded without interest the participating employers JoFaz and Y&M in the amount of $1,505,055.00 on overpaid withdrawal liability payments. (Kellner Decl. ¶¶ 19–20, Exh. E; Anspach Decl. ¶ 16.) Prior to refunding JoFaz and Y&M, the Trustees unanimously adopted a motion during the November 29, 2023 Board of Trustees meeting to return the overpayments without interest. (Anspach Decl. ¶ 16, Exh. F.) Before adopting the motion, Fund counsel stated that "the Trust Agreement is silent on the interest rate to be applied to late or overpaid withdrawal liability, and that the Fund has not charged interest on late withdrawal payments in the past." (*Id.* ¶ 16, Exh. F.)

Last, the Fund's current TPA, which has serviced the Fund since 2022, has represented that it has never charged interest on late withdrawal liability payments.[13] (Kellner, Decl. ¶¶ 15–

---

[13] The Fund is aware of only one instance where an 18% interest rate was applied in connection with overpaid and subsequently refunded withdrawal liability payments. In 2021, the Fund's prior TPA, the Dickinson Group, refunded another participating employer (CBT) with interest at the rate of 18% per annum. (Kellner Decl. ¶ 19, Exh. E.) The Fund is also aware of correspondence sent to participating employers by the prior TPA representing that late withdrawal liability payments were subject to an interest rate of 18% per annum. (*Id.* ¶ 20.) There does not appear to be any basis for this representation, and the current TPA (servicing the Fund since 2022) has not charged interest on any late withdrawal liability payments it has received from employers. (*Id.* ¶¶ 15–16, 20). In any event, correspondence from the prior TPA is not determinative. In *N.Y.C. Times Co.,* the Fund erred in using an 18% interest rate in connection with at least one withdrawal liability payments. 303 F. Supp. 3d at 261. The Court credited the Arbitrator's finding that "to the extent an 18% rate was used, it was either in error . . . or as a matter of statutory requirement necessitating 18% for delinquent contributions." *Id.*

16.)  This includes, among others, overdue payments submitted by participating employers Ganness, North Star, and Y&M.  (*Id.* ¶ 16.)

The facts presented here provide even more similarities to *N.Y.C. Times* decision where, among other things, (1) the fund's trust agreement set forth an interest rate for delinquent contributions, but not for withdrawal liability payments, (2) the trustees chose not to adopt a rule pertaining to an interest rate for withdrawal liability payments, and (3) the fund utilized inconsistent interest rates in connection with withdrawal liability payments, including seeking interest on withdrawal liability payments at the same rate as the Fund policy for delinquent contributions on one occasion.  *Id.* at 264–65.  Unlike the instant case, the fund in *N.Y.C. Times* also (1) charged interest for overdue withdrawal liability contributions outside of federal court actions, and (2) the trustees indicated during at least one meeting that the applicable interest on rates for withdrawal liability payments should equal the interest on delinquent contributions.  *Id.* at 265.  Here, the Fund has not charged interest on overdue withdrawal liability payments outside of federal court suits, and the Trustees never indicated that the interest rates for withdrawal liability payments should match the interest charged on delinquent contributions.  On both of these facts, the Fund here has even stronger evidence than the fund in *N.Y.C. Times* that it has not established a plan rule concerning applicable interest rates for withdrawal liability payments.

After the arbitrator in *N.Y.C. Times* ordered discovery and the submission of briefings, the arbitrator affirmed the fund's position that the applicable interest rates were the Prime Rates set forth by the PBGC.  *Id*. at 246.  The *N.Y.C. Times* court affirmed, reasoning that "[e]vidence from the Fund's Board meetings pulled in both directions: the Fund trustees indicated at one meeting that withdrawal liability interest rates should be the same as for delinquent contributions, but also that the trustees chose not to adopt a rule that explicitly relates to

withdrawal liability." *Id*. at 265.  Because the fund in *N.Y.C. Times* did not use a "consistently applied rate" in connection with late withdrawal liability payments, the court found that the applicable interest rates were the ones set forth by the PBGC.  *Id*.

The Court here should abide by the sound reasoning in *N.Y.C. Times* and hold that the Fund owes interest on the Refunded Interim Payments at the applicable PBGC Prime Rates.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court vacate the Award and hold that the Fund owes interest on the Refunded Interim Payments at the PBGC Prime Rates.  In the alternative, the Court should vacate the Award and remand the action to the Arbitrator in order to allow the parties to develop a sufficient record.

Dated: September 30, 2025
New York, New York

Respectfully submitted,

*/s/ William Anspach*
William Anspach
Benjamin Hollander

Friedman & Anspach
1500 Broadway, Suite 2300
New York, New York 10036
(212) 354-4500
wanspach@friedmananspach.com
bhollander@friedmananspach.com

*Attorneys for Plaintiffs*

23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

DEMOS P. DEMOPOULOS, RALPH BLASI,    *
WILLIAM CASSESE, JOHN A. CURCIO, and    *
KENNETH BARRETT, as Trustees and    *
Fiduciaries of the LOCAL 854 PENSION FUND,    *
   *
          Plaintiffs,    *
   *
       - against -    *      **CASE 1:25-CV-07175-JLR**
   *
ALLIED TRANSIT CORP.,    *
EMPIRE STATE BUS CORP.,    *
EMPIRE CHARTER SERVICE, INC., and    *
ANNA C. GANNESS, DDS, PC,    *
   *
          Defendants.    *
----------------------------------------------------------------X

## WORD COUNT CERTIFICATION

Pursuant to the Individual Rules and Practices of Judge Jennifer H. Rochon and Local Civil Rule 11.1(b) of the Southern District of New York, I hereby certify that the foregoing memorandum of law contains 7644 words, excluding the caption, table of contents, table of authorities, and signature block, as counted by Microsoft Word.

Dated: September 30, 2025
       New York, New York

                                Respectfully submitted,

                                  /s/   William Anspach
                                William Anspach

                                FRIEDMAN & ANSPACH
                                1500 Broadway, Suite 2300
                                New York, NY 10036
                                (212) 354-4500
                                wanspach@friedmananspach.com

                                Counsel to Plaintiffs